## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CAITLIN HASSETT, individually and on behalf of all others similarly situated, | ) ) ) | Case No.: |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| CHURCH & DWIGHT CO., INC., | ) ) | |
| Defendant. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Caitlin Hassett ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, brings this class action complaint against Defendant Church & Dwight Co., Inc. ("Defendant" or "Church & Dwight") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of Batiste® branded Dry Shampoo (the "Products[1]" or the "Dry Shampoo") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

---

[1] The Products refer to the following Batiste Dry Shampoo varieties: Bare; Clean & Light Bare; Plus Brilliant Blonde; Floral & Flirty Blush; Divine Dark; Hint of Colour for Dark Hair; Dark Hair; Tropical Exotic Coconut; Classic Clean; Clean & Classic Original; Light & Breezy Fresh; and Volumizing. However, as alleged herein, Defendant conceals the presence of benzene in the Product, thus discovery will reveal the all of the substantially similar products included in this action.

2. The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3. Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their hair and scalp, Defendant knew or should have known that the Products contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class members, by not including benzene on the Products' labels or otherwise warning about its presence.

4. Plaintiff and Class members reasonably relied on Defendant's representations that the Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5. Plaintiff and Class members purchased and used the Products and were therefore exposed to, or risked being exposed to, the harmful presence of benzene in the Product.

6. The Products are worthless because they contain or risk containing benzene, a known human carcinogen that is an avoidable ingredient in the Products and Defendant's manufacturing process. Indeed, the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

7. Defendant is therefore liable to Plaintiff and Class members for selling the Products without disclosing that the Products contain or risk containing benzene.

**PARTIES**

8. Plaintiff Caitlin Hassett is a resident and citizen of Chicago, Illinois. Plaintiff Hassett has purchased numerous varieties of the Products since at least 2015. Plaintiff purchased the Products on Amazon.com and in-person at Walgreens and Walmart in Chicago, Illinois. Most recently, Plaintiff purchased the Products on October 23, 2022 on Amazon.com.

9.      When purchasing the Products, Plaintiff Hassett reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for their intended use. Plaintiff Hassett read and relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiff Hassett would not have been willing to purchase the Products. The Products Plaintiff Hassett purchased were worthless because they either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiff Hassett was injured in fact and lost money as a result of Defendant's improper conduct.

10.      Defendant Church & Dwight Co., Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the state of New Jersey with its principal place of business located at 500 Charles Ewing Blvd, Ewing, New Jersey. Defendant sells its Batiste-branded haircare products, including the Products at issue, throughout the United States, including Illinois. The Products, including those purchased by Plaintiff and Class members, are available at various retail stores throughout the United States, including Illinois. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

## JURISDICTION AND VENUE

11.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Defendant was engaged in business activities in the state of Illinois.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Venue is also proper because Plaintiff resides in this District.

## COMMON FACTUAL ALLEGATIONS

**I.      Defendant's History in the Industry**

14.     Defendant Church & Dwight Co., Inc. is a consumer product business that sells household and personal care products under a variety of brand names.

15.     Defendant has eleven "power brands" which make up 80% of its consumer sales.[2] Batiste is one such brand.

---

[2] *See Church & Dwight Co. 2021 Annual Report*, available at  https://investor.churchdwight.com/static-files/31a1f3d3-4cbb-471c-a3ed-27d3a60f531a (Last accessed December 30, 2022)

4

16.     Defendant acquired the Batiste Dry Shampoo brand in 2011, and as of 2021, Batiste was the number one dry shampoo in the United States.[3]

17.     The dry shampoo market has grown dramatically in recent years and is currently valued at approximately $4 billion dollars.[4] As the undisputed leader in the market, Batiste Dry Shampoo maintains a significant share of this highly lucrative segment of the haircare industry.

18.     Defendant's products, including the Dry Shampoo, are manufactured, distributed, and sold throughout the United States, including the State of Illinois. The Products are sold in store and online at mass market retailers and specialty beauty stores such as Target, CVS, and Ulta.

19.     Defendant has gained the trust of consumers, who believe Defendant's promises that all of the ingredients in the Products "have been tested to ensure maximum safety."[5]

20.     The Products at issue are dry shampoos, which are a product designed to absorb the dirt, oil, and grease of the scalp without washing it.[6]

21.     Dry shampoos are typically administered from an aerosol can and made with a base of alcohol or starch.  When applied to the hair, the dry shampoo soaks up the oil and grease, making it look cleaner. According to the Batiste website, the Products are applied by spraying into the roots and then massaging the Products into the scalp.[7]

22.     The U.S. Food and Drug Administration ("FDA") classifies and regulates shampoos, including dry shampoos like the Products, as cosmetics.

---

[3] *Id.*
[4] https://www.factmr.com/report/4300/dry-shampoo-market (Last accessed December 30, 2022)
[5] https://www.batistehair.com/faqs (Last accessed December 30, 2022)
[6] https://www.webmd.com/beauty/what-is-dry-shampoo (Last Accessed December 30, 2022)
[7] https://www.batistehair.com/faqs (Last accessed December 30, 2022)

## II.     Benzene Is a Known Human Carcinogen

23.     The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[8]

24.     The Department of Health and Human Services has determined that benzene causes cancer in humans.[9]

25.     "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[10]

26.     Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[11]

27.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[12]

28.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[13]

---

[8] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (Last Accessed December 30, 2022).
[9]     *Facts About Benzene*, CDC (Last Accessed December 30, 2022) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[10]   *Benzene and Cancer Risk*, American Cancer Society (Last Accessed December 30, 2022) https://www.cancer.org/cancer/cancer-causes/benzene.html.
[11] *Id.*
[12]   *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (Last Accessed December 30, 2022).
[13] *Facts About Benzene, supra.*

### III. Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated

29.     The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[14]

30.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[15]

31.     The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[16]

32.     Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[17]

### IV. Exposure to Benzene in any Amount Is Extremely Dangerous

33.     A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[18]

---

[14] *Id.*

[15] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (Last Accessed December 30, 2022).

[16] David Light et al., *Valisure Citizen Petition on Benzene in Dry Shampoo Products* (Last Accessed December 30, 2022), https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf (the "*Valisure Citizen Petition*").

[17] *Id.*

[18] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388 (Last Accessed December 30, 2022).

34.     A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[19] The study concluded:

   a.  There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

   b.  Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

   c.  Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

35.     The CDC has stated that ways in which people "could be exposed to benzene" include[20]:

   a.  Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

   b.  Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

   c.  The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

   d.  Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

---

[19] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.
[20] *Facts About Benzene*, *supra*.

     e.   People working in industries that make or use benzene may be exposed to the highest levels of it.

     f.   A major source of benzene exposure is tobacco smoke.

36.    The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[21]

37.    "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[22]

38.    Benzene exposure from dry shampoo is especially troubling because the Product is applied to the scalp and around the face, with the remnants flying through the air likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

39.    In fact, inhaling benzene at levels of 0.4 parts per billion frequently over a lifetime might cause an additional cancer per 100,000 people.[23]

40.    The FDA allows for up to 2 parts per million of benzene in products where the use of benzene is "unavoidable" to produce a drug product with a significant therapeutic advance. However, dry shampoos are not a drug and contains no active pharmaceutical ingredient for therapeutic purpose; therefore, any significant detection of benzene in the Products could be deemed unacceptable.[24]

---

[21] *NIOSH Pocket Guide*, *supra*.
[22] *Facts About Benzene*, *supra*.
[23] https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf (Last Accessed December 30, 2022)
[24] *See Valisure Citizen Petition*, *supra*.

## V.     Discovery of Benzene in the Products

41.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure, an "independent laboratory"[25,] is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[26]

42.     In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238),"[27] and it is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[28]

43.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

44.     On October 31, 2022, Valisure reported its testing results for benzene in various types of dry shampoo utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[29]

---

[25] "About Us." https://www.valisure.com/about (Last Accessed December 30, 2022).
[26] *Valisure Citizen Petition*, *supra*.
[27] *Id.*
[28] *Id.*
[29] *Id.*

45.     GC-MS "is generally considered one of the most accurate analyses available."[30] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[31]

46.     "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[32]

47.     Valisure analyzed 148 unique batches from 34 brands of dry shampoo.[33]

48.     Valisure identified ten brands of dry shampoo which contained levels of benzene at 2 ppm or higher, including the Products at issue in this case.[34]

49.     Valisure's testing results were confirmed by the voluntary recalls of several dry shampoo products manufactured by Procter & Gamble and Unilever which were found to contain benzene.[35]

50.     Valisure specifically measured benzene concentrations from 0.97 to 5.21 ppm in the Products:[36]

---

[30] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (Last Accessed December 30, 2022).

[31] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

[32] *Valisure Citizen Petition*, *supra*.

[33] *Id.*

[34] *Id.*

[35] https://www.cnn.com/2022/10/24/business/unilever-shampoo-recall (Last Accessed December 30, 2022)

[36] *Valisure Citizen Petition*, *supra*.

| Product Description | UPC | Lot | Benzene Concentration (ppm) |
|---|---|---|---|
| Dry Shampoo Bare | 5010724529836 | RF1125 | 14.9 |
| Dry Shampoo Bare | 5010724529836 | RF1155 | 2.61 |
| Dry Shampoo Clean & Light Bare | 5010724529836 | RF0113 | 3.30 |
| Dry Shampoo Plus Brilliant Blonde | 5010724527467 | RF1054 | 1.70 |
| Dry Shampoo Floral & Flirty Blush | 5010724527399 | RF9077 | 1.47 |
| Dry Shampoo Bare | 5010724529836 | RF1181 | .73 |
| Dry Shampoo Fresh Breezy Citrus | 5010724527450 | RF1120 | 1.94 |
| Dry Shampoo Plus Divine Dark | 5010724527443 | RF1131 | 1.81 |
| Dry Shampoo Floral & Flirty Blush | 5010724527375 | RF0231 | 1.33 |

| | | | |
|---|---|---|---|
| Dry Shampoo Plus Divine Dark | 5010724527443 | RF9345 | 1.20 |
| Dry Shampoo & a Hint of Colour for Dark Hair | 5010724537443 | LR0083 | 1.11 |
| Dry Shampoo Dark Hair | 5010724533123 | RF1167 | 1.09 |
| Dry Shampoo Tropical Exotic Coconut | 5010724527511 | RF1259 | .83 |
| Dry Shampoo Original Classic Clean | 5010724527481 | RF1103 | 0.79 |
| Dry Shampoo Clean & Classic Original | 5010724527481 | RF0167 | .70 |
| Dry Shampoo Clean & Light Bar | 5010724529836 | RF0352 | .64 |
| Dry Shampoo Plus Divine Dark | 5010724528150 | RF1200 | .54 |
| Dry Shampoo Light & Breezy Fresh | 5010724527450 | LR9099 | .51 |
| Dry Shampoo Floral & Flirty Blush | 5010724527399 | RF7132 | .46 |

| | | | |
|---|---|---|---|
| Dry Shampoo Coconut & Exotic Tropical - 1.6 fl oz | 5010724527535 | RF8361 | .43 |
| Dry Shampoo Floral & Flirty Blush | 5010724527399 | RF8253 | .30 |
| Dry Shampoo Original Classic Fresh | 5010724533048 | RF1204 | .20 |
| Dry Shampoo Tropical Exotic Coconut | 5010724527535 | RF1350 | .20 |
| Volumizing Dry Shampoo | 5010724532966 | FG1183 | .19 |

51.     In some of the lots tested, the detected levels of benzene in the Products are greater than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[37] However, because benzene is not a requisite component of manufacturing or packaging dry shampoo, its presence in the Products is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[38]

---

[37] *Id.*
[38] *Id.*

52. David Light, Founder and Chief Executive Officer of Valisure, stated that "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[39]

53. The Products are not designed to contain benzene, and no amount of benzene is acceptable in dry shampoo such as the Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists the ingredients on the Products' labels, Defendant failed to disclose on the Products' labeling or anywhere in Defendant's marketing that the Product contains benzene.[40]

 

[39] *Id.*
[40] Picture available on authorized retailer Walmart's website. *See* https://www.walmart.com/ip/Batiste-Dry-Shampoo-Bare-Fragrance-4-23-OZ-Packaging-May-Vary/141628758?athbdg=L1100 (Last Accessed December 30, 2022).



54.     Despite its knowledge that the Products contain benzene, Defendant has failed to issue a voluntary recall of the Products.

**VI.     Benzene Renders the Product Adulterated, Misbranded, and Illegal to Sell**

55.     "Dry shampoo products are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[41]

56.     The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of cosmetic products.[42]

---

[41] *Valisure Citizen Petition*, *supra*.
[42] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (Last Accessed December 30, 2022).

57.     As cosmetic products regulated by the FDA, the Products are prohibited from being adulterated or misbranded. See FD&C Act, 21 U.S.C. §§ 361, 362.

58.     A cosmetic is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual..." 21 U.S.C. § 361(a).

59.     A cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 362 (a).

60.     FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[43]

61.     In cosmetic products, the FDA has announced recalls of various products contaminated with benzene, including other dry shampoos.[44]

62.     Moreover, because dry shampoos are cosmetics and not drugs, they contain no active pharmaceutical ingredient for therapeutic purpose which might create an exception to the presence of benzene.

63.     Regardless, Defendant's Products contain levels of benzene above 2 ppm, including, in some cases, more than 7 times that limit.[45]

64.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no benzene in them.

---

[43] *Valisure Citizen Petition*, *supra*.
[44] Food and Drug Administration. *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products* (December 17, 2021) (https://www.fda.gov/safety/recalls-market- withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry- shampoo-spray)
[45] *Valisure Citizen Petition*, *supra*.

65. The mere presence of benzene renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they "contains [a] poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof." 21 U.S.C. § 361(a).

66. The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 362(a).

67. A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

68. Similarly, in Illinois, any "advertisement of a food, drug, device or cosmetic shall be deemed to be false if it is false or misleading in any particular." 410 ILCS § 620/20.

69. The introduction of adulterated or misbranded cosmetics into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Complaint.

70. As alleged herein, Defendant has violated the FDCA; 410 ILCS § 620/20; Illinois' Consumer Fraud and Deceptive Trade Practices Act ("ICFA"); and various state consumer protection statutes. Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene contamination affecting the Products.

71. If Defendant had disclosed to Plaintiffs and putative Class Members that the Products contained or risked containing benzene and thus risked benzene exposure during use of the Products, Plaintiffs and putative Class Members would not have purchased the Products or they would have paid less for the Products.

72.     As a seller of a cosmetic, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the Products into the stream of commerce for consumers to use on their hair and scalp. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene, despite its claims that the Products' ingredients were tested for safety. Nor did it disclose to Plaintiffs in any advertising or marketing that its dry shampoo contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

## VII.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers

73.     The Products contains butane, isobutane and propane as propellants.

74.     Aerosols typically contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

75.     Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane and isobutane.

76.     Manufacturing companies that work with these volatile chemicals understand the risks of benzene contamination.[46]

---

[46] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

77. Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane and isobutane, knew or should have known of the risks of benzene contamination.

78. Defendant's use of butane and isobutane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

79. Defendant sold, and continue to sell, dry shampoo products containing butane and isobutane during the class period despite Defendant's knowledge of the risk of benzene contamination.

80. Federal and state regulatory regimes require that cosmetics marketed on a retail basis to consumers contain a list of ingredients.[47] Failure to comply with this requirement renders a cosmetic misbranded under the FD&C Act and analogous state regulatory acts, including 410 ILCS § 620/20.

81. Benzene is not listed on the Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.

82. Defendant has engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the Products, and nothing on the Products' labels otherwise insinuate, state, or warn that the Products contain benzene.

83. The presence of benzene in the Products renders the Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

---

[47] *See* 21 C.F.R. § 701.3

84. Had Defendant adequately tested its Products for benzene and other carcinogens and impurities, it would have discovered that its Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the Products illegal to distribute, market, and sell.

85. Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[48]

86. Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

87. By marketing and selling its body spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiffs and Class Members, Defendant warrants that the Products are safe to use rather than adulterated body sprays containing a dangerous, cancer-causing chemical.

88. Defendant did not disclose the actual or potential presence of benzene in its dry shampoo products on the Products' labeling, advertising, marketing, or sale of the Products.

89. Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.

90. Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiff and Class members would not have purchased the Products.

---

[48] https://monographs.iarc.who.int/list-of-classifications (Last Accessed December 30, 2022).

## VIII.   Injuries to Plaintiff and Class Members

91.     When Plaintiff purchased Defendant's Products, Plaintiff did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful carcinogen benzene. Not only would Plaintiff not have purchased Defendant's Products had she known the Products contained benzene, but she would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens and impurities.

92.     Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

93.     Further, given Defendant's position as a leader in the hair care industry and the top seller of dry shampoo in the United States, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

94.     Yet, when consumers look at the Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene. Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in the Products.

95.     No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (which do not even apply to Defendant's Products).

96. Thus, if Plaintiff and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

97. Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and the Class Members.

98. Plaintiff and Class members bargained for a dry shampoo product free of contaminants and dangerous substances. Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene—or at risk of containing the same—and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

99. As alleged above, Plaintiff and Class members' Products either contained benzene or were at significant risk of containing the same.

100. Plaintiff and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

101. Plaintiff individually and on behalf of all others brings this class action pursuant to Fed. R. Civ. P. 23.

102. Plaintiff seeks to represent a class defined as:

> All persons who purchased the Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

103. Plaintiff also seeks to represent a subclass defined as:

All persons who purchased the Products in Illinois for personal or household use within any applicable limitations period ("Illinois Subclass").

104.    Plaintiff also seeks to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[49]

105.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; (3) individuals who allege personal bodily injury resulting from the use of the Products; and (4) resellers of the Products.

106.    Plaintiff reserves the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

107.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

108.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

a.    Whether the Products contain benzene;

---

[49] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

b. Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

c. Whether Defendant knew or should have known that the Products contain benzene;

d. Whether Defendant misrepresented whether the Products contain benzene;

e. Whether Defendant failed to disclose that the Products contain benzene;

f. Whether Defendant concealed that the Products contain benzene;

g. Whether Defendant engaged in unfair or deceptive trade practices;

h. Whether Defendant violated the state consumer protection statutes alleged herein;

i. Whether Defendant was unjustly enriched; and

j. Whether Plaintiff and Class members are entitled to damages.

109. *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

110. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

111. *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to

bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

112.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF STATE CONSUMER FRAUD ACTS
**(On behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)**

113.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

114.    Plaintiff brings this Count on behalf of herself and the Consumer Fraud Multi-State Subclass against Defendant.

115.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

116.    Plaintiff and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Members of the Consumer Fraud

Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

117.     Defendant engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the Products, as discussed herein.

118.     Defendant intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

119.     Given Defendant's position in the hair care market as an industry leader, Plaintiff and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

120.     As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

121.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>**COUNT II**</u>
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT, 815 ILCS 505/1, et seq. ("ICFA")**
**(On behalf of Plaintiff and the Illinois Subclass)**

122.     Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though set forth fully herein.

123.     Plaintiff brings this cause of action on behalf of herself and the Illinois Subclass Members against Defendant.

124.     Plaintiff and other Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

125.     Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

126.     At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

127.     Plaintiff and the proposed Class are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

128.     The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

129.     The FDCA prohibits the introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

130.     As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

131.     The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

132.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

133.   Plaintiff and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's omission of the presence of benzene in the Products, Plaintiffs read and relied on Defendant's labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

134.   Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, et seq.

135.   Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

136.   Defendant advertised the Products with the intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

137.   Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

138.   Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products risked contained benzene, but Defendant not only failed to properly test and place the Products into the requisite quality review, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class members, by not including benzene or the risk of benzene contamination on the Products' labels or otherwise warning about its presence. Defendant engaged in misleading and deceptive advertising by misrepresenting that the Products were safe and also by omitting the material fact that the Products contain benzene. Defendant chose to label the

Products in this way to impact consumer choices and gain market dominance, as it is aware that all consumers who purchased the Products were exposed to and would be impacted by its omissions and would reasonably believe that the Products were safe for personal use and did not contain any dangerous contaminants, including benzene. However, the Products are not safe and free of benzene, as they are contaminated with the dangerous carcinogen, benzene.

139.    Defendant intended that Plaintiff and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

140.    Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

141.    Plaintiff and Class Members have been damaged as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

142.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations and material omissions regarding the presence of benzene in the Products.

143.    Had they been aware of the true nature of the Products, Plaintiff and Class Members either would have paid less for the Products or would not have purchased them at all.

144.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under 815 ILCS 505/10a. Plaintiff

and Class Members are also entitled to injunctive relief, seeking an order enjoining Defendant's unfair and/or deceptive acts or practices.

**COUNT III**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class and/or the Illinois Subclass and/or the Multi-State Subclass)**

145.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.    Plaintiff brings this Count on behalf of herself and the Nationwide Class and/or the Illinois Subclass and/or the Multi-State Subclass against Defendant.

147.    This claim is brought under the laws of the State of Illinois.

148.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

149.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

150.    Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which was not as Defendant represented them to be.

151.    Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiff and Class members.

152.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class members' overpayments.

153.    Plaintiff and Class members seek the establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for relief and judgment against Defendant as follows:

a.   Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class and Subclasses, and designating Plaintiff's counsel as Class Counsel;

b.   Awarding Plaintiff and Class members compensatory damages, in an amount to be determined at trial;

c.   Awarding Plaintiff and Class members appropriate relief, including but not limited to actual damages;

d.   For restitution and disgorgement of profits;

e.   Awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

f.   Awarding pre-judgment and post-judgment interest;

g.   For punitive damages; and

h.   Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: December 30, 2022          Respectfully submitted,

*/s/ Kevin Laukaitis*
Kevin Laukaitis
**LAUKAITIS LAW FIRM LLC**
737 Bainbridge Street #155
Philadelphia, PA 19147
Email: klaukaitis@laukaitislaw.com

***Attorneys for Plaintiff and the Proposed Classes***